**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| HYUNDAI TRANSLEAD AND HYUNDAI DE MEXICO S.A. DE C.V.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES INTERNATIONAL TRADE COMMISSION,<br><br>Defendant. | Court No. 26-03271<br><br>**NON-CONFIDENTIAL**<br><br>Business Proprietary Information Removed from Pages 11 to 14, 17 to 27 |

**COMPLAINT**

Pursuant to Rules 3(a)(2), 5, 7(a), 8, 10, and 11 of the Rules of the United States Court of International Trade, Plaintiffs Hyundai Translead and Plaintiff Hyundai de Mexico S.A. de C.V. ("HYMEX") (collectively, "Plaintiffs"), by and through their attorneys, Steptoe LLP, hereby allege the following for their complaint against Defendant, United States International Trade Commission:

**JURISDICTION**

1. Plaintiffs seek judicial review of the 2-1 final affirmative injury determination of the United States International Trade Commission ("Commission") in the antidumping ("AD") and countervailing duty ("CVD") investigations of chassis and subassemblies from Mexico, Thailand, and Vietnam. The Commission's final determination was published as *Chassis and Subassemblies from Mexico, Thailand, and Vietnam; Determinations*, 91 Fed. Reg. 35,554 (June 11, 2026) ("*Final Determination*"); *see also Chassis and Subassemblies from Mexico, Thailand, and Vietnam*, Inv. Nos. 701-TA-755-756 and 731-TA-1734-1736 (Final), USITC Pub. 5742 (June 2026) ("*Views and Final Report*").

2. The Department of Commerce ("Commerce") published notice of the AD orders on chassis and subassemblies from Mexico, Thailand, and Vietnam; and the CVD orders on chassis and subassemblies from Mexico and Thailand, in the *Federal Register* on June 18, 2026. *Certain Chassis and Subassemblies Thereof From Mexico and Thailand: Countervailing Duty Orders*, 91 Fed. Reg. 36,800 (June 18, 2026) ("*AD Orders*"); *Certain Chassis and Subassemblies Thereof From Mexico, Thailand, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 91 Fed. Reg. 36,806 (June 18, 2026) ("*CVD Orders*").

3. This Court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(II) and (a)(2)(B)(i) to review a final affirmative injury determination made by the Commission pursuant to 19 U.S.C. §§ 1671d(b) and 1673d(b). This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1581(c).

**STANDARD OF REVIEW**

4. The standard of review, as set forth in 19 U.S.C. § 1516a(b)(1)(B), is whether the determinations, findings, or conclusions of the Commission were "unsupported by substantial evidence on the record, or otherwise not in accordance with law."

**STANDING OF PLAINTIFFS**

5. Plaintiff HYMEX is a producer and exporter of subject chassis from Mexico and Plaintiff Hyundai Translead is a U.S. importer of subject chassis from Mexico.

6. As a foreign producer and exporter and a U.S. importer, Plaintiffs are interested parties within the meaning of sections 771(9)(A) and 516A(f)(3) of the Act, 19 U.S.C. §§ 1677(9)(A) and 1516a(f)(3). Plaintiffs also fully participated in the proceeding below. They submitted questionnaire responses, appeared at the Commission hearing, and filed pre- and posthearing briefs, as well as final comments. As interested parties that actively participated in

the proceeding below, and that are adversely affected by the contested determination, Plaintiffs have standing to commence this action under 19 U.S.C. §§ 1516a(a)(2)(A) and (d), 28 U.S.C. § 2631(c), and 28 U.S.C. § 1581(c).

## TIMELINESS OF THIS ACTION

7. The Commission published its affirmative final determination in the *Federal Register* on June 11, 2026. *See Final Determination*. Commerce published the AD and CVD orders in the *Federal Register* on June 18, 2026. *See AD Orders*; *CVD Orders*.

8. Plaintiffs filed their Summons in this action on July 17, 2026. Therefore, Plaintiffs commenced this action within the 30-day period specified in 19 U.S.C. § 1516a(a)(2)(A)(i)(II) and 28 U.S.C. § 2636(c).

9. Additionally, Plaintiffs are filing this complaint within 30 days of filing the Summons. Accordingly, this action is timely filed pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(II), and Rules 3(a)(2) and 6(a) of the Rules of this court.

## PROCEDURAL HISTORY AND BACKGROUND

10. On February 26, 2025, Petitioner U.S. Chassis Manufacturers Coalition ("Petitioner"), consisting of domestic producers Stoughton Trailers, LLC and Cheetah Chassis Corporation, filed a petition seeking the imposition of AD duties on imports of chassis and subassemblies from Mexico, Thailand, and Vietnam; and CVD duties on imports of chassis and subassemblies from Mexico and Thailand. *See Chassis and Subassemblies From Mexico, Thailand, and Vietnam; Institution of Antidumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations*, 90 Fed. Reg. 11,180 (Mar. 4, 2025).

11. The Commission instituted its preliminary phase injury investigation on February 27, 2025 and published notice thereof in the *Federal Register* on March 4, 2025. *See id.*

12. The Department initiated the AD and CVD investigations on March 18, 2025 and published notice thereof in the *Federal Register* on March 24, 2025. *See Certain Chassis and Subassemblies Thereof From Mexico and Thailand: Initiation of Countervailing Duty Investigations*, 90 Fed. Reg. 13,452 (Mar. 24, 2025); *Certain Chassis and Subassemblies Thereof From Mexico, Thailand, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 90 Fed. Reg. 13,457 (Mar. 24, 2025).

13. On April 18, 2025, the Commission rendered its affirmative preliminary injury determination, concluding that there was "reasonable indication that an industry in the United States is materially injured by reason of imports" of the subject merchandise. *See Chassis and Subassemblies From Mexico, Thailand, and Vietnam*, 90 Fed. Reg. 16,553 (April 18, 2025).

14. Following the Department's preliminary AD and CVD determinations, the Commission published its notice scheduling the final injury investigation in the *Federal Register* on December 15, 2025. *See Chassis and Subassemblies From Mexico, Thailand, and Vietnam; Scheduling of the Final Phase of Countervailing Duty and Antidumping Duty Investigations*, 90 Fed. Reg. 58,054 (Dec. 15, 2025) ("*Scheduling Notice*"). The final injury investigation ultimately resulted in the Commission's affirmative injury determination in the *Final Determination*, with two Commissioners voting in the affirmative and one Commissioner voting in the negative.

15. Commerce then published its *AD Orders* and *CVD Orders* on June 18, 2026. *See* ¶ 2 *supra*.

16. The facts relating to the pertinent procedural and substantive elements of the final injury investigation and the *Final Determination* are summarized below.

**RELEVANT COMMISSION PROCEDURE**
**AND THE UNDERLYING INVESTIGATION**

***The Commission's Collection of Information and Dissemination to the Parties***

17. In its investigations, the Commission "obtains extensive company-specific business proprietary information ('BPI') from U.S. producers, importers, and purchasers and from foreign producers, principally through questionnaires." *Antidumping and Countervailing Duty Handbook; Fourteenth Edition*, USITC Pub. 4540 (June 2015) at II-26 ("*AD/CVD Handbook*").

18. The statute requires the Commission to "make all {BPI} presented to, or obtained by it, during a proceeding . . . available to interested parties who are parties under" an Administrative Protective Order ("APO"), which "protect{s} the confidentiality of such information." *See* 19 U.S.C. § 1677f(c)(1)(A); *AD/CVD Handbook* at II-27. Thus, during the investigation, parties subject to the APO "receive copies of completed producer, importer, and purchaser questionnaire responses as well as BPI versions of the petition, briefs and other submissions{.}" *Id.* at II-27–II-28. Parties to the proceeding that submit BPI must serve such BPI on other parties. 19 U.S.C. § 1677f(d). However, the Commission also provides BPI through periodic issuances to the record, each known as an "APO Release." *See An Introduction to Administrative Protective Order Practice in Import Injury Investigations*, USITC Pub. 5280 (Jan. 2022) at 19 (explaining that the Commission will notify parties subject to the APO "that BPI . . . gathered in investigations is available under the APO").

19. In the underlying final injury investigation, the Commission issued questionnaires to U.S. producers, U.S. importers, foreign producers, and U.S. purchasers of chassis on January 5, 2026, and set a deadline for responses thereto on February 9, 2026. *See Chassis and Subassemblies from Mexico, Thailand, and Vietnam; Inv. No. 701-TA-755-756 and 731-TA-1734-1736 (Final)*, https://ids.usitc.gov/case/8271/investigation/8743 (last accessed August 14, 2026)

("*Investigation Docket*"). The Commission subsequently issued 15 APO Releases prior to making its final injury determination, on February 11, 2026; February 18, 2026; February 25, 2026; March 4, 2026; March 11, 2026; March 18, 2026; March 25, 2026; April 7, 2026; April 8, 2026; April 9, 2026 (two releases); April 24, 2026; April 29, 2026; May 8, 2026; and May 13, 2026.

20. These APO Releases contained not only questionnaire responses, but also follow-up exchanges between Commission Staff ("the investigator, industry analyst, accountant/auditor, and economist under the direction of the supervisory investigator") and parties responding to the questionnaires. *Cf. AD/CVD Handbook* at II-11 (defining "Commission Staff"). For example, Commission Staff sought clarification or correction of information submitted in questionnaire responses via email, which parties would in turn provide over email. These APO Releases contained such emails.

***Staff Report, Briefing, and Hearing***

21. In both preliminary and final injury investigations, Commission Staff prepare an "objective, factual document" – known as the staff report – containing "a presentation and analysis of all of the statistical data and other information collected through questionnaires, public documents, field visits, staff interviews, and other sources" that "addresses various factual issues that are relevant to the investigation{.}" *AD/CVD Handbook* at II-11. In a final injury investigation, Commission Staff first issue the prehearing report, "transmitted to the Commission and APO parties five business days before prehearing briefs are due and ten business days before the hearing{.}" *See* 19 C.F.R. § 207.22(a); *AD/CVD Handbook* at II-18.

22. In the underlying final injury investigation, the Commission issued the prehearing report on April 7, 2026; set a deadline of April 14, 2026 for prehearing briefs; and held its hearing on April 20, 2026. *Scheduling Notice*, 90 Fed. Reg. at 58,056. Plaintiffs submitted their

prehearing brief and participated at the hearing, including through multiple witnesses representing both Plaintiffs and key customers. *See generally Chassis and Subassemblies from Mexico, Thailand, and Vietnam (Final): Hyundai Translead and Hyundai de Mexico S.A. de C.V. Prehearing Brief* (Apr. 14, 2026) ("*Hyundai Prehearing Br.*"); *Chassis and Subassemblies from Mexico, Thailand, and Vietnam (Final): Submission of Witness Testimony* (Apr. 20, 2026).

23. Following submission of prehearing briefs, the hearing, and submission of posthearing briefs, Commission Staff issue the staff report, "intended to supplement and correct the information contained in the prehearing staff report." 19 C.F.R. § 207.22(b).

24. In the underlying final injury investigation, the Commission set a deadline of April 28, 2026 for posthearing briefs, and issued the staff report on May 8, 2026. *Scheduling Notice*, 90 Fed. Reg. at 58,056; *see Investigation Docket*. Plaintiffs submitted their posthearing brief. *See generally Chassis and Subassemblies from Mexico, Thailand, and Vietnam (Final): Hyundai Translead and Hyundai de Mexico S.A. de C.V. Posthearing Brief* (Apr. 28, 2026) ("*Hyundai Posthearing Br.*").

***<u>Closing of the Record and Final Comments</u>***

25. "The Commission closes the factual record (i.e., ceases to accept new factual information) approximately four business days after the staff report is issued." *AD/CVD Handbook* at II-22. On that date, the Commission "disclose{s} to all parties to the investigation all information it has obtained on which the parties have not previously had an opportunity to comment." 19 C.F.R. § 207.30(a). Two days later, parties "have an opportunity to file comments on any information disclosed to them after they have filed their posthearing brief . . . . Comments shall only concern such information, and shall not exceed fifteen (15) pages of textual material."

19 C.F.R. § 207.30(b); *AD/CVD Handbook* at II-22–II-23. "Comments containing new factual information shall be disregarded." 19 C.F.R. § 207.30(b); *see also* 19 U.S.C. § 1677m(g).

26. In the underlying final injury investigation, the Commission closed the record on May 13, 2026 (on which, as noted above in paragraph 19, it issued the final APO Release) and set a deadline of May 15, 2026 for the submission of final comments. *Scheduling Notice*, 90 Fed. Reg. at 58,056. Plaintiffs submitted their final comments, which conformed to the Commission's requirements. *See generally Chassis and Subassemblies from Mexico, Thailand, and Vietnam (Final): Hyundai Translead and Hyundai de Mexico S.A. de C.V. Final Comments* (May 15, 2026) ("*Hyundai Final Comments*").

27. Five days later, on May 20, 2026, the Commission made its final vote in the investigation; Chair Amy Karpel and Commissioner Jason Kearns voted in the affirmative, while Commissioner David Johanson voted in the negative. *See Views and Final Report* at 1, 1.1.

## THE COMMISSION'S MATERIAL INJURY ANALYSIS AND THE UNDERLYING INVESTIGATION

### ***Statutory Injury Factors***

28. In a final injury investigation, the Commission must determine whether an "industry in the United States" (i.e., the domestic industry) was materially injured, or was threatened with material injury, by reason of imports of the subject product (known as "subject imports"). *See* 19 U.S.C. §§ 1671d(b)(1), 1673d(b)(1). The Commission must evaluate three factors to make this determination. *See* 19 U.S.C. § 1677(7)(B)(i)(I)-(III).

29. First, the Commission shall consider the volume of subject imports, i.e., "whether the volume of imports of {subject} merchandise, either in absolute terms or relative to production or consumption in the United States, is significant." 19 U.S.C. § 1677(7)(B)(i)(I), (C)(i).

30. Second, the Commission shall consider the price effects of subject imports, i.e., "whether there has been significant price underselling" by subject imports "as compared with the price of" the domestic like product, and whether subject imports "otherwise depress{} prices to a significant degree or prevent{} price increases, which otherwise would have occurred, to a significant degree." 19 U.S.C. § 1677(7)(B)(i)(II), (C)(ii)(I)-(II).

31. Third, the Commission shall consider the "impact" of subject imports on the domestic industry by evaluating "all relevant economic factors which have a bearing on the state of the industry, including but not limited to" e.g., production, profitability, and employment. *See* 19 U.S.C. § 1677(7)(B)(i)(III), (C)(iii)(I)-(V).

32. Importantly, the statute empowers the Commission to consider "other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports." 19 U.S.C. § 1677(7)(B)(ii). And, the Commission is required to "evaluate all relevant economic factors . . . within the context of the business cycle and conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii).

33. The Commission conducts its injury analysis based on a period of investigation ("POI") covering "the most recent three complete calendar years as well as the year-to-date {or 'interim'} period of the current year and the like period of the previous year." *See AD/CVD Handbook* at I-11. In the underlying investigation, the POI covered full years 2022 through 2024, and an interim period of January through September 2025. *See Views and Final Report* at 13.

***<u>Plaintiffs' Material Injury Argument and the Commission's Determination</u>***

34. Plaintiffs provided evidence and argument demonstrating that subject imports did not cause material injury to the domestic industry based on the three statutory factors. Before

addressing these factors, Plaintiffs demonstrated that the U.S. chassis market was characterized by "severe instability" during the POI. *See*, *e.g.*, *Hyundai Prehearing Br.* at 1-2.

35. The factors driving such instability – established through public information, Commission data, and purchaser affidavits and testimony – included (1) skyrocketing demand early in the POI (i.e., 2022 and early 2023) due to supply chain challenges during and after the COVID-19 pandemic; (2) a supply-constrained domestic industry unable or unwilling to supply chassis to many purchasers at that time, thus causing a shortage; (3) customers' changing product preferences, from 20 and 40-foot chassis to 53-foot chassis; and (4) cratering demand starting in 2023 due to market normalization. *See Hyundai Prehearing Br.* at 1-20, Exhibits 1-20; *Hyundai Posthearing Br.* at 1-5, Exhibit 1 at 21-41, Exhibits 2-8; *Hyundai Final Comments* at 1-7.

36. Domestic supply constraints were key. Petitioner asserted that, but for subject imports early in the POI, the domestic industry could have supplied more chassis. *See*, *e.g.*, *Certain Chassis and Subassemblies Thereof from Mexico, Thailand, and the Socialist Republic of Vietnam: Petitioner's Pre-Hearing Brief* (Apr. 14, 2026) at 70 ("*Petr. Prehearing Br.*"). Yet, purchaser affidavits, testimony, and domestic producers' contemporaneous public statements discussing their inability to supply chassis in 2022 led Plaintiffs to argue that the record did not support this claim. *See*, *e.g.*, *Hyundai Prehearing Br.* at 13-18, Exhibits 1-5, 18-20; *Hyundai Posthearing Br.* at 1-5, Exhibit 1 at 21-25, Exhibits 2-8; *Hyundai Final Comments* at 3-5.

37. Both the Commission majority ("Majority") and Commissioner Johanson's dissent ("Dissent") found subject import volumes to be significant. *Views of the Commission (Confidential)* (June 9, 2026) at 43-44 ("*Confidential Views*"); *Dissenting Views of Commissioner David S. Johanson (Confidential)* (June 9, 2026) at 49-50 ("*Confidential Dissent*").[1] However,

[1] The *Views and Final Report* (USITC Pub. 5742) cited in this Complaint contains the redacted version of the *Views of the Commission* ("*Views*") and *Dissenting Views of Commissioner David*

whereas the Majority found significant price effects and an adverse impact, the Dissent concluded that there were no significant price effects and no adverse impact by reason of subject imports. *Confidential Views* at 44-62; *Confidential Dissent* at 50-69. Plaintiffs' arguments and the Commission's determination with respect to each statutory factor are summarized below.

***<u>Subject Import Volume</u>***

38. Data collected by the Commission demonstrated that the absolute volume of subject imports declined by [ ] percent – from [ ] units in 2022 to [ ] units in 2024; and remained steady from interim 2024 to interim 2025. *Hyundai Prehearing Br.* at 23. Likewise, relative volume (i.e., market share) of subject imports started the POI at [ ] percent in 2023, fell to [ ] percent in 2024, and fell further to [ ] percent in interim 2025. *Id.*

39. As Plaintiffs explained, although volume was high at the start of the POI (when demand peaked and the domestic industry faced supply constraints), it declined thereafter, especially as the market collapsed. *Id.* at 23-29; *see also Hyundai Posthearing Br.* at 2, 11-13; *Hyundai Final Comments* at 11. Commission data reflected the market collapse, showing that apparent U.S. consumption declined from 79,126 units in 2022 to 16,214 units in 2024 (i.e., by 79.5 percent). *See Hyundai Prehearing Br.* at 6. Plaintiffs argued that subject volume was not significant in light of these market conditions and circumstances.

40. Both the Majority and Dissent disagreed with Plaintiffs. Each listed the absolute and relative volumes of subject imports during the POI and trends thereof, concluding that subject volumes were significant. *Confidential Views* at 43-44; *Confidential Dissent* at 49-50. Neither

*S. Johanson* ("*Dissent*"). The discussion in the remainder of this Complaint refers to the confidential versions of the *Views* and *Dissent*, which were issued to the parties via APO Release dated June 11, 2026 and are paginated differently from the *Views and Final Report.*

considered the market factors underlying, or which could otherwise explain, such levels or trends – and in turn, could lead to a finding that such volumes were not significant. *See id.*

***<u>Subject Import Price Effects – Underselling, Price Depression, and Price Suppression</u>***

41. With respect to underselling, the record was mixed, showing 71 instances of underselling, involving [ ] percent of subject chassis by volume, versus 61 instances of overselling, involving [ ] percent of subject chassis by volume. *Id.* at 29-30. However, Plaintiffs demonstrated that the underselling was not significant because (1) there was less underselling in every successive year of the POI; (2) there was predominant overselling of subject 53-foot chassis, i.e., the most in-demand product during the POI that represented [ ] of U.S. producers' shipments; and (3) record evidence demonstrated that the underselling of other (i.e., 20- and 40-foot) chassis was either comparatively modest or not the reason why purchasers purchased such products. *Id.* at 30-36, Exhibit 4; *see also Hyundai Posthearing Br.* at 4, 13, Exhibit 1 at 27-28, 42-46, 66, Exhibit 9.

42. The Majority disagreed, citing "majority underselling by subject imports during the POI" that "was most pervasive in 2022{.}" *Confidential Views* at 45-46. The Majority did not discuss the differences in underselling by year or by product, nor the contrary evidence regarding purchasers' reasons for their sourcing in 2022, in the manners raised by Plaintiffs. *See id.* at 44-46. By contrast, the Dissent recognized that the "pattern of underselling varied among the pricing products"; that overselling predominated later in the POI; and that underselling did not cause market share to shift toward subject imports. *See Confidential Dissent* at 51-53.

43. The Majority also based its finding of significant underselling on the quantity of confirmed lost sales, with which the Dissent likewise disagreed. *See Confidential Majority* at 46-

50; *Confidential Dissent* at 56-58. Given the importance of this finding to the Majority's injury determination, Plaintiffs address lost sales in more detail in paragraphs 53 through 82 below.

44. With respect to price depression, Plaintiffs noted that the domestic industry's average unit value ("AUV") increased from $[ ] in 2022 to $[ ] in 2024, ending interim 2025 at $[ ] – such that domestic prices were not depressed by subject imports, particularly given the collapse of demand. *Hyundai Prehearing Br.* at 37. With respect to price suppression, Plaintiffs discussed how the domestic industry's ratio of cost of goods sold to net sales ("COGS/net sales ratio") fluctuated – first down, and then up, in a manner entirely unrelated to subject imports, which declined in volume every year of the POI. *Id.* at 37-38.

45. Regarding price depression, the Majority discussed the fact that the domestic industry's prices fluctuated, and that its AUVs rose, and did not explicitly make a finding of significant price depression. *See Confidential Majority* at 52. The Dissent observed similar trends but ultimately found no significant price depression because "U.S. producers' U.S. prices were higher for most of the period of investigation than U.S. prices had been at the beginning of the period, and only declined as demand weakened, subject imports retreated, and subject import underselling turned to overselling{.}" *Confidential Dissent* at 53.

46. Regarding price suppression, the Majority discussed trends in the domestic industry's COGS/net sales ratio – which fell and then rose – without explicitly finding significant price suppression. *See Confidential Majority* at 53. The Dissent, on the other hand, analyzed the same trends and concluded that "{n}early [ ] of the deterioration in the COGS-to-net-sales ratio came . . . as a result of higher unit COGS, which even the Petitioners recognized as resulting from the greatly reduced volume over which to spread the costs." *Confidential Dissent* at 56.

47. Thus, with respect to price effects, the Majority concluded that:

> {S}ignificant underselling by subject imports resulted in subject imports taking a significant volume of sales from the domestic industry in each year of the POI, including in 2022 when demand was at its highest level. As a result, the domestic industry's market share was lower than it otherwise would have been but for the presence of significant volumes of lower-priced subject imports. We therefore find that cumulated subject imports had significant price effects.

*Confidential Majority* at 54. Thus, the Majority's finding was predicated entirely on its views regarding underselling and lost sales. The Dissent found that because:

> {T}here was (1) no significant market share shift away from the domestic industry toward subject imports; (2) that there was an increase in U.S. producers' U.S. prices until 2024 by which time subject imports had retreated in concert with plunging demand and were predominantly overselling; and (3) that the domestic industry's COGS-to-net-sales ratio only declined in 2024 due to higher unit COGS, which were due to demand trends and not subject import price competition . . . {and} despite mixed underselling, there were no adverse price effects by subject imports.

*Confidential Dissent* at 58. For the Dissent, despite some underselling, the lack of a market share shift, or significant price suppression and depression, meant that price effects were not significant.

***<u>Subject Import Adverse Impact</u>***

48. Plaintiffs demonstrated that, although the domestic industry's condition at the end of the POI was worse than at the start, there was no relationship between the volumes and prices of subject imports and the domestic industry's condition – and thus, no adverse impact. *See, e.g.*, *Hyundai Prehearing Br.* at 45-47; *Hyundai Posthearing Br.* at 13-14, Exhibit 1 at 47-64.

49. In other words, the domestic industry's condition improved markedly from 2022 to 2023, which saw "[ ] percent increases in its net sales quantity, value, and AUV; and roughly a [ ] percentage point increase in all of its profit margins" while "gross profit [ ]"; and "net income [ ]." *Hyundai Prehearing Br.* at 46 (emphasis original). "While the domestic industry's

50. The Majority and Dissent each recognized the improvement from 2022 to 2023, followed by decline from 2023 to 2024. *See Confidential Majority* at 54-58; *Confidential Dissent* at 59-62. However, each of their conclusions on impact largely stemmed from their views on price effects. According to the Majority, "cumulated subject imports had a significant adverse impact on the domestic industry. The record shows that significant underselling resulted in the domestic industry losing a significant volume of sales to subject imports over the POI, experiencing lost sales in each year of the POI." *Confidential Majority* at 58.

51. Conversely, the Dissent found that declining subject volumes and market share and a lack of significant price effects meant that "any deterioration . . . is not attributable to subject imports" – even with "mixed underselling, the domestic industry increased its market share, did not see significant erosion in pricing ( . . . until late in the period, when a collapse in demand dominated the conditions of competition), attracted investment and capital expenditures, and experienced improving profitability" in the early POI. *Confidential Dissent* at 68-69.

52. Given the centrality of the Commission's lost sales data to the Majority's affirmative injury determination, Plaintiffs discuss the relevant facts concerning these data below.

## **THE ROLE OF "LOST SALES" IN THE UNDERLYING INVESTIGATION AND THE COMMISSION'S ANALYSIS**

### ***Lost Sales and the U.S. Purchasers' Questionnaire***

53. The statute does not require the Commission to evaluate lost sales (i.e., where purchasers purchased subject imports instead of the domestic like product specifically because those subject imports were lower priced). However, "the Commission has considered lost sales . . . as an indication that subject imports negatively impacted prices for the domestic like product." *LG Elecs. Inc. v. United States Int'l Trade Comm'n*, 38 C.I.T. 1562, 1581 (2014).

54. In the underlying investigation (as in all other investigations) the U.S. Purchasers' Questionnaire included **Question II-1** which, among other data, asked that purchasers list their total purchases of subject merchandise from each country (i.e., chassis produced in Mexico, Thailand, and Vietnam), as well as the domestic like product (i.e., chassis produced in the United States) for each year of the POI. In relevant part:

| Item | 2022 | 2023 | 2024 | January—September 2025 |
|---|---|---|---|---|
| | Quantity (in units) | | | |
| **Fleet size at the beginning of the period** | | | | |
| **Fleet size at the end of the period** | | | | |
| **Purchases of chassis produced in—** United States | | | | |
| Mexico | | | | |
| Thailand | | | | |
| Vietnam | | | | |
| All other countries[1] | | | | |
| Sources unknown[2] | | | | |
| Total purchases | 0 | 0 | 0 | 0 |

Then, **Question II-7** requested that purchasers provide information so that the Commission could analyze the existence and quantity of lost sales, as follows:

II-7. <u>Purchasing subject imports rather than domestic products</u>.—

(a) Since January 1, 2022, did your firm import and/or purchase imports of chassis from Mexico, Thailand, and/or Vietnam instead of purchasing U.S.-produced chassis? Respond for each subject country.

| Source | Yes (also respond to parts (b) and (c)) | No (If "No" for all countries, skip to next question) |
|---|---|---|
| Mexico | ☐ | ☐ |
| Thailand | ☐ | ☐ |
| Vietnam | ☐ | ☐ |

(b) If you responded "Yes" to part (a), was the imported product priced lower than the domestic product?

| Source | Yes | No |
|---|---|---|
| Mexico | ☐ | ☐ |
| Thailand | ☐ | ☐ |
| Vietnam | ☐ | ☐ |

(c) If you responded "Yes" to part (a), was price a primary reason for importing and/or purchasing subject imports rather than domestic product?

| Source | Yes | If Yes, estimate the quantity of imports purchased and/or imported instead of domestic product since January 1, 2022 (in units) | No | If No, please indicate the reason your firm imported and/or purchased imports instead of domestic product |
|---|---|---|---|---|
| Mexico | ☐ | | ☐ | |
| Thailand | ☐ | | ☐ | |
| Vietnam | ☐ | | ☐ | |
| If the quantity reported above exceeds the total quantity reported in II-1, please explain. | | | | |

***<u>The Prehearing Report and Parties' Arguments Regarding Lost Sales</u>***

55. In the underlying investigation, the prehearing report stated that the Commission received 22 responses to the U.S. Purchasers' Questionnaire, representing purchases and imports of [ ] units over the POI. *Chassis and Subassemblies from Mexico, Thailand, and Vietnam*, Inv. Nos. 701-TA-755-756 and 731-TA-1734-1736 (Final), Prehearing Report at 5.25 (Apr. 7, 2026) ("*Prehearing Report*"). Elsewhere, it stated that apparent U.S. consumption over the POI amounted to 170,224 units. *See id.* at C.3 (Table C.1). Thus, the U.S. purchasers' responses accounted for [ ] percent of the market.

56. With respect to Question II-7, 13 out of 22 purchasers stated that they purchased subject merchandise instead of the domestic like product, i.e., answering "Yes" for any subject country in response to Question II-7(a). *Id.* at 5.25. Of these 13, seven indicated that subject imports were priced lower than the domestic like product, i.e., answering "Yes" for any subject country in response to Question II-7(b). *Id.* Of these seven, only three stated that price was a primary reason for purchasing subject imports rather than the domestic like product in response to Question II-7(c), quantifying an estimated [ ] total units of subject imports purchased. *Id.* at 5.27-5.28 (Table 5.17).

57. Plaintiffs thus argued that these [ ] units did not amount to a significant quantity of lost sales because they represented only [ ] percent of purchasers' overall purchases and imports during the POI and just [ ] percent of total apparent U.S. consumption over the POI. *Hyundai Prehearing Br.* at 39.

58. In its prehearing brief, Petitioner suggested that lost sales amounted to more than the [ ] units reported in the prehearing report, citing to two specific purchasers' questionnaire responses. *See Petr. Prehearing Br.* at 55, 64.

59. First, Petitioner cited purchaser [ ]. *Id.* at 55. That purchaser's response to Question II-7 indicated that, although it purchased lower-priced imports from [ ] instead of the domestic like product, i.e., answering "Yes" to Questions II-7(a) and II-7(b), it did **<u>not</u>** do so because they were lower-priced, i.e., answering "No" to Question II-7(c) and explaining that "[ ]." [ ] U.S. Purchasers' Questionnaire Response (Feb. 9, 2026) at II-7 (Doc. ID 872372). Petitioner thus suggested that [ ] purchased these chassis because they were lower-priced, despite that purchaser's direct response to the contrary. *See Petr. Prehearing Br.* at 55.

60. Second, Petitioner cited the questionnaire response of purchaser [ ]. *Petr. Prehearing Br.* at 64. That purchaser's response to Question II-7 indicated that it purchased lower-priced imports from [ ] instead of the domestic like product, i.e., answering "Yes" to Questions II-7(a) and II-7(b), and that it did so because they were lower-priced, i.e., answering "Yes" to Question II-7(c) – but [ ]. [ ] U.S. Purchasers' Questionnaire Response (Feb. 6, 2026) at II-7(c) (Doc. ID 873363). Petitioner thus suggested that the

Commission should consider all [ ] chassis that [ ] purchased from [ ] over the course of the POI, reported in response to Question II-1 of [ ]'s U.S. Purchasers' Questionnaire Response, as confirmed lost sales. *See Petr. Prehearing Br.* at 64.

61. Plaintiffs responded to Petitioner's argument regarding [ ] in their posthearing brief. Plaintiffs explained that this purchaser "did not specify an exact quantity" of chassis purchased due to lower prices, and that "absent a purchaser's actual reporting of quantity as confirmed lost sales, it is unreasonable for the Commission to reinterpret a questionnaire response and consider that all purchases made by that firm from [ ] are therefore confirmed lost sales." *Hyundai Posthearing Br.*, Exhibit 1 at 69-70 n.205.

***Revisions to the Commission's Lost Sales Data in the Staff Report***

62. In the Commission's May 8, 2026 staff report, the lost sales quantity was revised from [ ] units to [ ] units. *Chassis and Subassemblies from Mexico, Thailand, and Vietnam*, Inv. Nos. 701-TA-755-756 and 731-TA-1734-1736 (Final), Posthearing Report at 5.27-5.28 (Table 5.17) (May 8, 2026) ("*Staff Report*"). The change was due to changes in reporting for (1) [ ], which was now listed as responding "Yes" to all three parts of Question II-7, and a total lost sales quantity of [ ] units; and (2) [ ], for which the Commission staff now reported all [ ] units as confirmed lost sales. *Id.*

63. As noted above in paragraph 19, the Commission issued 15 APO Releases over the course of the final injury investigation. Of those, six were issued concurrently with or after issuance of the prehearing report; as well as before, or concurrently with, issuance of the staff report (i.e., APO Releases on April 8, 2026 (containing the prehearing report); April 9, 2026 (two releases); April 24, 2026; April 29, 2026; and May 8, 2026 (containing the staff report)).

None of these APO Releases contained any additional information or explanation as to why Commission Staff revised [ ]'s and [ ]'s lost sales data.

64. It was not until the Commission's final APO Release on May 13, 2026 that Commission Staff issued the missing information regarding these data revisions to the parties. Plaintiffs discuss this information in paragraphs 65 through 82 below. As discussed therein, despite the fact that the Commission only released such information to the parties on May 13, 2026, the record establishes that Commission Staff was developing that information over the course of several weeks or months before that date, effectively withholding it from the parties subject to the APO until the last possible moment – the day designated for the closing of the factual record.

***<u>Purchaser [ ] and Plaintiffs' Arguments</u>***

65. As seen in the May 13, 2026 APO Release, on [

] and [

]. [ ]

(Doc. ID 880287) ("[ ]"). Commission Staff [ ] despite the fact that [ ]'s existing answer explicitly stated that it while [

], it did not buy subject imports because they were lower priced. *See* ¶ 59 *supra*.

66. On [

]. [ ]. That same day, [ ] submitted an updated

U.S. Purchasers' Questionnaire response. *See id.* That response showed a revised response stating that [ ] purchased subject imports because they were lower priced and listing a quantity of [ ] units as confirmed lost sales. [ ] U.S. Purchasers' Questionnaire Response (Apr. 23, 2026) at II-7 (Doc. ID 882153).

67. Presumably, the Commission could have included the above [ ] and revised questionnaire response in the APO Releases on April 24, 2026; April 29, 2026; or May 8, 2026. But the Commission only included it in the May 13, 2026 APO Release.

68. In their Final Comments, Plaintiffs highlighted the fact that [ ]. *Hyundai Final Comments* at 14. More importantly, however, Plaintiffs explained that [ ]'s purchases could not be considered lost sales. *See id.* Specifically, the record established that "**[ ]** originally sought to purchase chassis from **[ ]**. *Id.* (citation omitted). And, [ ] was ultimately [ ] to have been [ ]. *Id.* (quoting *Staff Report* at 3.16 (Table 3.16), 3.16 n.10). Plaintiffs also pointed to "other [ ] in [ ], including that [ ]." *Id.*

69. Thus, the "fact that a [ ] won these sales; [ ] – all while [ ]" led

Plaintiffs to argue that these sales could not be confirmed lost sales. *Id.* at 15 (emphasis original).

***<u>Purchaser [ ] and Plaintiffs' Arguments</u>***

70. As seen in the May 13, 2026 APO Release, on [ ] and [ ]. [ ] (Doc. ID 881984) ("[ ]").

71. The [ ] the May 13, 2026 APO Release did not show a [ ]. However, it did show that [ ] filed a revised U.S. Purchasers' Questionnaire Response on [ ] that addressed all of the other questions [ ]. *Compare id.* with [ ] U.S. Purchasers' Questionnaire Response (Mar. 13, 2026) (Doc. ID 881987). As [ ] was not an interested party participating in the investigation, [ ] was not required to serve its revised questionnaire response on other parties, nor did it do so.

72. The same [ ] to follow up, [ ]." [ ].

73. Nothing prevented the Commission from including the initial portions of the above [ ] and revised questionnaire response in the APO Releases on March 18, 2026; March 25, 2026; April 7, 2026; April 8, 2026; April 9, 2026; or April 24, 2026 – as well as

the subsequent portions of the [ ] in the APO Releases on April 29, 2026 or May 8, 2026. But it waited until the May 13, 2026 APO Release to issue all of these documents, effectively depriving Plaintiffs the right to submit information relevant to this significant change in reporting.

74. Such information was readily available. [ ] had [ ]. *See* [ ]. If Commission had not withheld these further developments until May 13, 2026, when the record had closed, Plaintiffs could have and would have submitted such information to the Commission, including in their posthearing brief.

75. Limited to the record, Plaintiffs (as well as Thai respondent CIE Manufacturing) could only argue in their final comments that "a review of record information, including [ ]'s other answers in its U.S. Purchasers' Questionnaire response, as well as the Commission's pricing data, make clear that [ ] did not likely purchase all [ ] chassis because they were purportedly lower-priced than the domestic like product." *Hyundai Final Comments* at 13-14. This information included [ ]'s responses to other questions in its U.S. Purchasers' Questionnaire Response suggesting that price was less important than other factors, as well as the fact that [ ]. *Id.* at 13-14, nn.77-78.

***<u>The Role of Lost Sales in the Commission's Determination</u>***

76. Both the Majority and the Dissent addressed the lost sales in their respective views, each discussing the two purchasers individually.

77. The Majority concluded that the quantity of [ ]'s [ ] units was reason enough "find these lost sales **alone** to be significant" – thereby indicating that [ ]'s lost sales data, notwithstanding [ ]'s additional lost sales, supported its finding of significant price effects. *Confidential Majority* at 47-48 (emphasis added). Addressing Plaintiffs' and CIE's arguments, the Majority stated that [ ]'s purchases of 53-foot chassis in 2022 and 2023 corresponded with underselling of that same product, and otherwise addressed the issue of [ ]'s contradictory questionnaire responses in a footnote, responding only to part of the arguments raised by Plaintiffs and CIE. *See id.* at 48-49, 48 n.186.

78. With respect to [ ], and despite the record evidence, which included verbatim quotes from [ ] explaining that it [ ] – the Majority stated that "Hyundai's cites to the record do not substantiate its assertion that [ ] supplied [ ] with subject imports due to [ ] inability to supply them with domestic product." *Id.* at 50, 50 n.193. And, though the Commission "acknowledge{d} that CBP has determined certain Vietnamese chassis imported by [ ] should have been designated as country-of-origin China," it nevertheless concluded that this did not disqualify the entirety of the revised quantity cited by [ ] to be confirmed lost sales. *See id.* at 50.

79. As noted above in paragraphs 43, 47, and 50, the Majority cited the revised lost sales data as one of the two pillars underlying its finding of significant price effects (with the other being "majority underselling"), and consequently, adverse impact. Even though the record was replete with (1) evidence of the lack of any effect of underselling in 2022 and (2) statements from multiple domestic producers citing their inability to supply customers with chassis in 2022 and 2023, the Majority concluded that "significant underselling resulted in the domestic industry

losing a significant volume of sales to subject imports over the POI, experiencing lost sales in each year of the POI" and that "the impact of the large volumes of lost sales in 2022 particularly reverberated for the duration of the POI." *Id.* at 58. The Majority found these lost sales to have been the dispositive factor establishing price effects, and consequently, material injury.

80. The Dissent, conversely, recognized the challenges posed by the late revision of lost sales data, noting that the "significance of this change brought comment from all partes in their final comments, but it is unfortunate that a robust exchange of views was no longer possible due to the timing of the revisions." *Confidential Dissent* at 56-57.

81. With respect to [ ], the Dissent stated that, because [ ] purchased 53-foot chassis, and given the record regarding predominant overselling of such products, this meant that although "[ ] may believe that it purchased these imports primarily on the basis of price, the price involved was not below the prevailing U.S. price for [ ] those imports." *Id.* at 57. Similarly, the Dissent cited "complications surrounding the lost sales allegations of [ ], which suggest that, in the end, the sale of subject imports was not completed." *Id.*

82. However, the Dissent went onto explain, a "larger reason to discount the newly claimed lost sales is that subject imports lost significant U.S. market share over the period of investigation and U.S. prices for the pricing products remained elevated throughout the first two years of the period, at a time when the vast majority of subject imports had already entered, before declining demand began to erode pricing for some of the pricing products in 2024." *Id.* at 57-58. In other words, the Dissent did not find the late-revised lost sales data sufficient to overcome the broader trends on the record that belied any finding of significant price effects.

## STATEMENT OF CLAIMS

### COUNT 1: DEPRIVATION OF HYUNDAI'S PROCEDURAL DUE PROCESS RIGHTS

83. Paragraphs 10 to 82 are incorporated by reference.

84. The Commission received and pursued updated information regarding lost sales over the course of the investigation, but delayed follow-up requests and ultimately withheld the information until the very last moment that it could be disclosed to the parties. By doing so, the Commission deprived Plaintiffs of their procedural due process rights.

85. This Court has recognized that interested parties have "a constitutionally protected interest in antidumping investigations" and that "the governing statute and applicable regulations set out the parties' procedural rights." *See Conn. Steel Corp v. United States*, 30 C.I.T. 1658, 1668 (2006). The statute further establishes that timely submitted information "shall be subject to comment by other parties to the proceeding within such reasonable time as the Commission shall provide" and otherwise establishes that the Commission shall close the record and "provide the parties with a final opportunity to comment on the information . . . upon which the parties have not previously had an opportunity to comment" while prohibiting the submission of new factual information in such opportunity. 19 U.S.C. § 1677m(g); *see also* 19 C.F.R. §§ 207.25, 207.30 (Commission regulations regarding posthearing briefs and final comments, respectively).

86. Here, Commission Staff [ ], and [ ]. *See* ¶¶ 70-71 *supra*. Commission Staff then [ ]. *See* ¶ 72 *supra*. This meant that, even if [ ], Plaintiffs were precluded from submitting new factual information with their posthearing brief regarding any such

response. And even though [ ] and there were two further APO Releases, the Commission did not issue all of this information until its final APO Release on May 13, 2026. *See* ¶¶ 70-73 *supra*.

87. By withholding this information until the day the record was closed, Plaintiffs were effectively deprived of their right to submit information that would have undermined the reliability of this key piece of information. Because the Commission released this information on the last possible day, Plaintiffs could only comment in a limited form and manner (i.e., in their final comments, involving a page limit and most critically, prohibiting the submission of new factual information).

88. This limitation violated Plaintiffs' procedural due process rights, because it prevented their ability to meaningfully comment on the information as provided by the Act. *See* 19 U.S.C. § 1677m(g); *see also* 19 C.F.R. §§ 207.25, 207.30.

## **COUNT 2: THE COMMISSION'S RELIANCE ON LOST SALES INFORMATION**

89. Paragraphs 10 to 82 are incorporated by reference.

90. The Commission's reliance on the lost sales data to find significant price effects was unsupported by substantial evidence. In finding these lost sales to be significant, the Majority disregarded evidence on the record that called into question the relevance of such data, including broader pricing trends; inconsistent responses within each respective purchaser's questionnaire response; and extensive information regarding U.S. producers' supply constraints. The timing and nature of the revisions, and the Commission's delayed disclosure of them, further undermined their probative value and limited the degree to which the Commission was able to reasonably consider them.

**COUNT 3: THE COMMISSION'S PRICE EFFECTS ANALYSIS**

91. Paragraphs 10 to 82 are incorporated by reference.

92. The Commission's price effects analysis was unsupported by substantial evidence. In finding significant price effects, the Majority cited to the existence of "majority" underselling. By doing so, it ignored or downplayed extensive quantitative and qualitative data demonstrating that such underselling had no effect on U.S. producers, and failed to take into account the relevance of overselling on the record – both of which the Dissent recognized. The Majority also discussed, and then disregarded the lack of significant price depression or price suppression – both of which the Dissent cited as reason to find no significant price effects.

93. The Majority's refusal to recognize the variation in over- and underselling by product and within the POI was also contrary to its practice in other cases where it has found no significant underselling despite the existence of "majority" underselling. This, as well as its refusal to engage with the relevance of the lack of significant price depression or price suppression, all render the *Final Determination* unsupported by substantial evidence.

**COUNT 4: THE COMMISSION'S IMPACT ANALYSIS**

94. Paragraphs 10 to 82 are incorporated by reference.

95. The Commission's impact analysis was unsupported by substantial evidence. The record of the underlying investigation demonstrated significant improvement in the condition of the domestic industry from 2022 to 2023, before it worsened in 2024. Given the trends in subject import volumes and pricing, and the near total collapse of apparent consumption over the POI, these facts indicated no causal relationship between subject imports and the state of the domestic industry. The Majority did not engage with this lack of causation, unreasonably finding a connection between "majority" underselling and revised lost sales data

(focused on 2022) and the state of the domestic industry in 2024. The Dissent, conversely, recognized the importance of the intervening improvement to the domestic industry in 2023. The Majority's refusal to factor the domestic industry's improvement in 2023 into its impact analysis renders the *Final Determination* unsupported by substantial evidence.

**COUNT 5: THE COMMISSION'S VOLUME ANALYSIS**

96. Paragraphs 10 to 82 are incorporated by reference.

97. The Commission's conclusion that subject import volume was significant was unsupported by substantial evidence. Both the Majority and the Dissent reviewed the data concerning subject import volumes and changes thereto and found that volumes were significant. This conclusion disregarded the fact that volumes continually declined during the POI, which the Commission has found in other cases to support finding a lack of significant volume. Moreover, both the Majority and the Dissent failed to take into account or discuss the significant market volatility, including domestic supply constraints, when evaluating whether subject import volume was "significant."

**DEMAND FOR JUDGMENT AND PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

(1) Enter judgment in favor of Plaintiffs;

(2) Hold and declare that the *Final Determination* is unsupported by substantial evidence and otherwise not in accordance with law;

(3) Remand this matter to the Commission with an explicit instruction to reopen the administrative record with respect to the issue of lost sales, and to issue a revised *Final Determination* in conformity with the Court's decision; and

(4) Grant Plaintiffs such additional relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Ron Kendler
Eric C. Emerson
Stephanie W. Wang
Ron Kendler

**Steptoe LLP**
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-1327
rkendler@steptoe.com

*Counsel to Plaintiffs Hyundai Translead and Hyundai de Mexico S.A. de C.V.*

Date: August 14, 2026